IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| MARC-ANDRE KIRCHHOF, | ) | CIV. NO. 15-00175 JMS-KSC |
| | ) | |
| Plaintiff, | ) | ORDER (1) DENYING IN PART |
| | ) | AND GRANTING IN PART |
| vs. | ) | DEFENDANTS' MOTIONS FOR |
| | ) | SUMMARY JUDGMENT, DOC. |
| HAWAII ASSOCIATION OF UNION | ) | NOS. 43 and 47; and (2) GRANTING |
| AGENTS, HAWAII GOVERNMENT | ) | HAUA'S AND YUEN'S MOTION |
| EMPLOYEES' ASSOCIATION, | ) | FOR JOINDER, DOC. NO. 50 |
| LOCAL 152, AMERICAN | ) | |
| FEDERATION OF STATE, | ) | |
| COUNTY AND MUNICIPAL | ) | |
| EMPLOYEES, AFL/CIO | ) | |
| (HGEA/AFSCME LOCAL 152); | ) | |
| MICHAEL YUEN, in his official | ) | |
| capacity as HAWAII ASSOCIATION | ) | |
| OF UNION AGENTS President and | ) | |
| Representative; MICHELE MITRA, in | ) | |
| her official capacity as Maui Island | ) | |
| Division Chief for HGEA/AFSCME | ) | |
| LOCAL 152; WILBERT HOLCK, in | ) | |
| his official capacity as Deputy | ) | |
| Executive Director for | ) | |
| HGEA/AFSCME LOCAL 152, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**ORDER (1) DENYING IN PART AND GRANTING IN PART
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, DOC. NOS. 43
AND 47; AND (2) GRANTING HAUA'S AND YUEN'S  MOTION FOR
JOINDER, DOC. NO. 50**

# I. **INTRODUCTION**

Plaintiff Marc-Andre Kirchhof ("Plaintiff") filed this action asserting

that (1) his former employer, Hawaii Government Employees' Association, Local

152, American Federation of State, County and Municipal Employees, AFL-CIO

("HGEA"), breached its collective bargaining agreement ("CBA") in violation of

§ 301 of the Labor Management Relations Act ("LMRA") by wrongfully

terminating him; (2) his union, Hawaii Association of Union Agents ("HAUA"),

breached its duty of fair representation in violation of the National Labor

Relations Act ("NLRA") by declining to arbitrate his grievance; and (3) HGEA

and HAUA's (collectively, "Defendants")[1] actions amount to intentional infliction

of emotional distress ("IIED").  Plaintiff seeks reinstatement, compensatory

damages, and punitive damages.

Currently before the court are (1) Defendants' Motions for Summary

Judgment, Doc. Nos. 43 and 47, and (2) HAUA's and Yuen's Motion for Joinder,

Doc. No. 50.  Based on the following, the court DENIES in part and GRANTS in

---

[1] Plaintiff also named Michael Yuen, Michele Mitra, and Wilbert Holck as defendants in this action.  However, Plaintiff conceded that these individuals were improper parties under § 301, Doc. No. 67, Opp'n at 40, and later clarified that "Plaintiff is not seeking personal liability against the[se] [t]hree [i]ndividuals in Plaintiff's IIED claims."  Doc. No. 82, Plaintiff's Supplemental Brief and Answer to the Court's Entry of Order Dated May 5, 2016, at 3.  Accordingly, the court GRANTS Defendants' Motions for Summary Judgment as to Defendants Yuen, Mitra, and Holck.

part Defendants' Summary Judgment Motions.  The court GRANTS HAUA's and Yuen's Motion for Joinder.

## II. <u>BACKGROUND</u>

**A.     Factual Background**

### *1.     Plaintiff's HGEA Career*

Plaintiff began working for HGEA's Maui Division Office as a full-time Union Agent on February 2, 2004.  Doc. No. 44, HGEA's Concise Statement of Facts ("CSF") ¶¶ 1-2.[2]  HGEA's Maui Division is a small office with only a handful of employees.  *See* Doc. No. 68-25, Pl.'s Ex. 23 (indicating that HGEA's Maui Division office presently employs four people).  As a Union Agent, Plaintiff's work was supervised by HGEA's Maui Division Chief.  Doc. No. 44, HGEA's CSF ¶ 6.  According to Plaintiff, he "met expectations or [was] outstanding in every performance or job review during his 10 years with HGEA."  Doc. No. 70, Pl.'s CSF ¶ 3.

Beginning June 17, 2014 -- several months after Plaintiff's ten-year anniversary with HGEA -- HGEA promoted Michele Mitra ("Mitra") from her position as Union Agent to Maui Division Chief.  Doc. No. 44, HGEA's CSF ¶ 7;

---

[2] Where the parties do not dispute a particular fact, the court cites directly the party's CSF.

*see also* Doc. No. 44-4, Declaration of HGEA Union Agent Tehani Nunez

("Nunez Decl.") ¶ 3 ("Mitra was transitioning job roles from Union Agent to

Division Chief").  Though not entirely clear, it appears that after Mitra's

promotion, there were only two full-time Union Agents at HGEA's Maui Division

Office: Tehani Nunez and Plaintiff.  *See, e.g.*, Doc. No. 44-4, Nunez Decl. ¶¶ 2-4

(implying that Nunez and Plaintiff were HGEA's only two Union Agents on

Maui).  *See also* Doc. No. 68-25, Pl.'s Ex. 23 (indicating that HGEA's Maui

Division office presently employs only two Union Agents).

    On July 2, 2014, Mitra held a meeting with Nunez and Plaintiff.  *See*

Doc. No. 44-4, Nunez Decl. ¶ 2; Doc. No. 68-1, Declaration of Marc-Andre

Kirchhof ("Pl.'s Decl.") ¶ 3.  The parties dispute what happened at this meeting.

According to HGEA, Mitra informed Nunez and Plaintiff that, because of her

promotion, she "would no longer be able to take on new cases" and that new cases

would be assigned to Plaintiff and Nunez.  Doc. No. 44-4, Nunez Decl. ¶ 2.

Nunez says that Plaintiff "did not take on new cases" and that "new cases were

assigned to HGEA Union Agents on Oahu and [Nunez]."  *Id*. ¶ 4.

    By contrast, Plaintiff says that "[t]here was no discussion of work

assignments at this meeting."  Doc. No. 68-1, Pl.'s Decl. ¶ 3.  Instead, Plaintiff

states that the July 2, 2014 meeting involved Nunez describing "an issue with a

particularly uncooperative member" and that Mitra "immediately inquired whether the member was 'white.'"  *Id.*  Plaintiff says that "[a]fter the meeting [he] complained to [Mitra] about her racist comments" and said "that it made [him] uncomfortable."  *Id.*  Plaintiff further claims that he "always volunteered" to accept work, Doc. No. 44-14, HGEA's Ex. 10 ("Pl.'s Dep.") at 69:14-15, and that he "never refused to take on work, cases, assignments, or any other tasks when asked to do so by a superior."  Doc. No. 68-1, Pl.'s Decl. ¶ 22.

On August 2, 2014 -- a Saturday -- various HGEA employees, including Plaintiff, agreed to participate in a political canvassing event.[3]  Plaintiff emailed Mitra at 11:15 a.m., and stated: "FYI: I am not able to come to the 8/2 Ka'ala canvassing this *morning*."[4]  Doc. No. 44-15, HGEA's Ex. 11 (emphasis added).  That same day, Nunez "observed [Plaintiff] playing soccer" at H.A. Baldwin Park,[5] Doc. No 44-4, Nunez Decl. ¶ 5, and it appears that Nunez subsequently reported Plaintiff's soccer activities to HGEA.  Doc. No. 48-1,

---

[3]  HGEA clarified at the hearing that participation in this event was voluntary.

[4]  According to Plaintiff, he missed the canvassing event because he "had to attend a funeral" and he "went early to help set up."  Doc. No. 68-1, Pl.'s Decl. ¶ 12.

[5]  According to Nunez, she was at Baldwin Park because she "went to watch [her] friend . . . play soccer."  Doc. No. 44-4, Nunez Decl. ¶ 5. The schedule for Plaintiff's recreational soccer league indicates that Plaintiff's soccer team began playing at 3 p.m. that afternoon.  Doc. No. 44-13, HGEA's Ex. 9, Soccer Schedule.

Declaration of Michael Yuen ("Yuen Decl.") ¶ 57.  HGEA never contacted Plaintiff about missing the August 2, 2014 event.[6]  Doc. No. 68, Pl.'s CSF ¶ 13.

Beginning the next Monday (August 4, 2014) through Thursday (August 7, 2014), Plaintiff was out sick.  Doc. No. 44-11, HGEA's Ex. 7, Timesheet.  On August 8, 2015 (Friday), all HGEA offices were closed unexpectedly due to "severe weather conditions" caused by a hurricane.  Doc. No. 44-17, HGEA's Ex. 13, Employee Bulletin.

On August 9, 2014 -- another Saturday -- various HGEA employees, including Plaintiff, agreed to participate in a phone banking event for a political race.[7]  Doc. No. 44-14, Pl.'s Dep. at 88.  Plaintiff did not participate,[8] *id.*, and that same day, Nunez "observed [Plaintiff] standing on the sidelines of the soccer field," Doc. No. 44-4, Nunez Decl. ¶ 6, and apparently reported Plaintiff's soccer activities to HGEA.  *See* Doc. No. 48-1,Yuen Decl. ¶ 57.  HGEA never contacted Plaintiff about missing the August 9, 2014 event.  Doc. No. 68-1, Pl.'s Decl. ¶ 13.

---

[6]  Plaintiff has submitted evidence that physical activity was consistent with his medical leave.  *See* Doc. No. 68-1, Pl.'s Decl. ¶ 11 ("I played in a Maui recreational soccer league in order to get more physical activity as advised by my doctor.  Each game I forced myself to go and see if it helped.").

[7]  HGEA clarified at the hearing that the phone banking event was likewise voluntary.

[8]  During discovery, Plaintiff stated that he was unable to participate due to a power outage.  *See* Doc. No. 44-14, Pl.'s Dep. at 88.

From August 11, 2014 through September 4, 2014, Plaintiff missed work while on sick leave.[9]  Doc. No. 44, HGEA's CSF ¶ 20.  During this period, Plaintiff submitted weekly doctor's notes to HGEA.  *Id.* ¶ 21.  Plaintiff says he was available by phone and email.  Doc. No. 68-1, Pl.'s Decl. ¶ 8.  HGEA claims, however, that "[w]hile on sick leave, Plaintiff's location and whereabouts were unknown."[10]  Doc. No. 68-17, Pl.'s Ex. 15 at 12.

On the morning of September 3, 2014, Plaintiff emailed HGEA explaining that he was "still out sick due to illness."  Doc. No. 68-3, Pl.'s Ex. 1. The doctor's note attached to Plaintiff's email stated that Plaintiff should "continue off work until 9/10/14 due to occupational stress."  *Id.*

HGEA terminated Plaintiff by letter dated September 4, 2014.  Doc. No. 44-22, HGEA's Ex. 18, Termination Letter.  HGEA's termination letter did not provide a reason for Plaintiff's termination, *id.*, and HGEA admits that "Plaintiff was not contacted or warned to discuss his employment status" prior to

---

[9]  During discovery -- i.e., after Plaintiff was terminated -- Plaintiff indicated that he was "probably" at soccer games held on two Saturdays while he was out on sick leave (August 23, 2014 and August 30, 2014).  *See* Doc. No. 44-14, HGEA's Ex. 10 at 106.  *See also id.* at 111 (explaining that Plaintiff "may" have been at the August 30th game and he "may" have played but that he "highly doubt[ed] it because [he] . . . wasn't feeling good").

[10]  During oral argument, HGEA's counsel admitted that HGEA was aware of Plaintiff's phone number and address -- in fact, HGEA mailed the termination letter to Plaintiff's home. Clearly, HGEA could have contacted Plaintiff with little effort prior to his termination.

his termination.  Doc. No. 68-17, Pl.'s Ex. 15 at 12.

On September 8, 2014, Plaintiff received HGEA's termination letter. Doc. No. 68-1, Pl.'s Decl. ¶ 14.  Plaintiff was "confused, surprised and shocked," *id.* ¶ 15, and "couldn't believe it and had no idea why" he was terminated.  *Id.* Plaintiff then emailed Wilbert Holck ("Holck"), HGEA's Executive Director, and requested "in writing the specific reasons of the termination action."  Doc. No. 44-24, HGEA's Ex. 20.  According to HGEA, Holck sent Plaintiff a responsive letter on September 9, 2014 stating: "Your employment with HGEA was terminated effective September 4, 2014 due to your behaviors that displayed a disregard for your position as a Union Agent IV and significantly impacted the HGEA Maui Division Office."  Doc. No. 44-25, HGEA's Ex. 21.  Plaintiff denies ever receiving this letter.  Doc. No. 68-1, Pl.'s Decl. ¶ 17.

### 2. *Plaintiff's HAUA Membership*

Throughout his employment with HGEA, Plaintiff was a member of HAUA.  Doc. No. 44, HGEA's CSF ¶ 3.  "HAUA is a labor union that serves as the exclusive bargaining agent for Union Agents employed by HGEA."  *Id.* ¶ 4. The relationship between HGEA and HAUA is governed by a CBA, *id.* ¶ 5, and "any conflict between the provisions of [the CBA] and any directive of [HGEA]" must be resolved in favor of the CBA.  *See* Doc. No. 44-8, CBA at 1 ("Article 2 -

Conflict").

Under the CBA, HGEA cannot discipline or discharge HAUA members "without proper cause."  *See id.* at 5 ("Article 12 - Discipline and Discharge").  HAUA members also have certain rights with regard to HAUA, such as the right to HAUA representation for grievances that arise with HGEA that are covered by the CBA.  *See id.* at 2 ("Article 4 - Union Representation"); *see also id.* at 21-23 ("Article 43 - Grievance Procedure").  Toward that end, the CBA outlines a formal three-step grievance procedure: In Steps 1 and 2, the HAUA member is entitled to meet with an HAUA Representative and HGEA's "island division chief or [her] designee" to discuss the grievance.  *Id.* at 21-22.  "If the grievance is not resolved at Step 2 and [HAUA] desires to proceed with arbitration, it shall serve written notice on [HGEA] . . . . of its desire to arbitrate within ten (10) working days after receipt of [HGEA's] decision at Step 2."  *Id.* at 22.

### 3. *The Grievance Process*

#### a. *HAUA's representation from September 8th through October 6th*

On September 8, 2014, Plaintiff emailed HAUA's President and Representative, Michael Yuen ("Yuen"), on two occasions.  First, Plaintiff told Yuen that he would like to file a grievance against HGEA for wrongful termination in violation of Article 12 of the CBA.  Doc. No. 48-3, HAUA's Ex. 2.

Plaintiff's second email requested that Yuen include nine additional violations of the CBA.[11]  Doc. No. 48-6, HAUA's Ex. 5.

From September 8, 2014 through October 6, 2014, Plaintiff and Yuen regularly communicated.  To begin, Yuen sent Plaintiff a draft Step 1 Grievance for Plaintiff's consideration on September 8, 2014, and indicated he would file the Step 1 Grievance with HGEA as soon as Plaintiff approved Yuen's draft.  Doc. No. 48-7, HAUA's Ex. 6.  Plaintiff then suggested edits to Yuen's draft.  Doc. No. 48-8, HAUA's Ex. 7.

On September 10, 2014, Yuen emailed Plaintiff with a revised draft. *See* Doc. No. 48-9, HAUA's Ex. 8.  Yuen also wrote:

> I continue to have concerns regarding your request to list articles other than Article 12 - Discipline.  Because [HGEA] did not provide a reason for the discharge, citing other articles could draw attention away from the employers (sic) lack of reason for the discharge and open avenues for the Employer to fabricate reasons for the discharge.  However, per your request I will continue to list all the articles you cited.

*Id.*  Plaintiff requested that Yuen file the grievance as drafted.  Doc. No. 48-10, HAUA's Ex. 9.  Three days later, Plaintiff emailed Yuen:

---

[11]  Specifically, Plaintiff requested the grievance include the following CBA violations: Article 10 - Non-Discrimination; Article 11- Seniority; Article 12- Discipline and Discharge; Article 13 - Personnel File; Article 14 - Evaluations; Article 18 - Vacancies; Article 21 - Work Assignments; Article 24 - Sick Leave; Article 35 - Safety and Health.  Doc. No. 48-6, HAUA's Ex. 5.

> For the record, HAUA or you as the representative need
> to exactly identify the exact[]/specific reasons of my
> wrongful termination so we can establish the proper
> defense strategies.  With HGEA's certified letter dated
> September 4, 2014 and received by me on the 8th, it does
> not identify these nor I ever was (sic) informed prior of
> any pending investigation or other matters etc.  Please no
> time extensions for the grievance information!

Doc. No. 48-11, HAUA's Ex. 10.

On September 15, 2014, Yuen filed Plaintiff's Step 1 Grievance with

HGEA.  Doc. No. 48-12, HAUA's Ex. 11.  The Grievance contended:

> The discharge notice came as a surprise without any
> warning of the charges against [Plaintiff], or any
> explanation of [HGEA's] evidence supporting the action.
> The action appears to have been taken in the absence of
> any formal investigation and most importantly the
> opportunity for the [Plaintiff] to present an explanation
> of his story before the action was taken.  We contend the
> [Plaintiff's] discharge from employment was without just
> and proper cause and violated the . . . CBA.

*Id.*  HAUA also requested "a grievance meeting and legible copy of the following

information be provided within seven (7) working days as stipulated in Article 43

- Grievance Procedure of the aforementioned subject CBA."  *Id.*  Specifically,

HAUA asked for:

> 1.   All documents, including but not limited to all
>      memorandums, reports, investigations, letters,
>      statements, correspondence, notes and tape
>      recordings that formed the basis for the discharge
>      action taken against the [Plaintiff].

2.      All material utilized in educating employees of the
        meaning and proper interpretation of the policies
        and procedures, rules and regulations upon which
        their conduct will be judged.

3.      All prior disciplinary actions involving the same
        or similar violations for which other employees
        were disciplined.

4.      All documents that established that [HGEA]
        forewarned the [Plaintiff] of the specific
        policy/procedure, rule/regulation for which he is
        being disciplined, and that further violations
        would lead to disciplinary action.

5.      List of all witnesses involved in the investigation;
        by name, position title, place of employment, and
        daytime telephone number.

6.      [Plaintiff's]  performance evaluations for the past
        two (2) years.

7.      All documents [HGEA] intends to introduce
        during the hearing of this matter.

*Id.* According to Plaintiff, neither he nor HAUA "received any information or

documentation pursuant to the Step 1 [G]rievance letter."  Doc. No. 68-1, Pl.'s

Decl. ¶ 18.

        Two days later, on September 17, 2014, HAUA and HGEA mutually

agreed to waive the Step 1 Grievance Meeting and move Plaintiff's grievance to

Step 2.  Doc. No. 48-13, HAUA's Ex. 12.  That same day, Yuen filed a Step 2

Grievance that was substantively identical to the Step 1 Grievance. *Id.*

Meanwhile, Plaintiff and Yuen continued to communicate regularly. For example, on September 18, 2014, Yuen asked Plaintiff to provide a rationale for the various CBA Articles identified in the Step 2 Grievance. Doc. No. 48-15, HAUA's Ex. 14. That same day, Yuen sent Plaintiff another email stating:

> HAUA has not received any grievance information and I do not believe [HGEA] has a clear reason stated or any hard evidence to support the discharge action. [HGEA] appears to have acted without any due process afforded to you. Absent any hard evidence on the part of [HGEA], their case looks very damaging and waiting for information only delays justice.
> . . . .
> In preparation for the Step 2 meeting, our first goal is to challenge [HGEA's] discharge action absent due process . . . . [HGEA] needs to prove how they acted with just and proper cause. Absent written reason for the discharge or hard evidence to support the action, our remedy is clear. Immediate reinstatement to your position and make you whole. The sooner we get to this point the better.
>
> Beyond Article 12 – Discipline; you may argue the articles you wanted listed. Although I do not agree with raising or arguing those articles, you seem to have a plan and I'll defer to you to present your rationale and evidence . . . . Should you prefer to provide me with your rationale and evidence on the articles violated[,] I will present on your behalf. Let me know which you prefer.
>
> I will be pushing to have the Step 2 meeting in a timely manner and am prepared to move the grievance to arbitration. I will need your help on how we proceed

13

thereafter as it will involve financing the case.

Doc. No. 48-17, HAUA's Ex. 16.

On September 24, 2014, Plaintiff emailed Yuen requesting an update "on the evidence requested that [HGEA] used to justify the termination action." Doc. No. 48-19, HAUA's Ex. 18.  Two hours later, Yuen responded that HGEA "has yet to provide any written reason or any grievance information.  Absent any, [HGEA's] discharge action appears [to be] without just and proper cause." *Id.* The next day, on September 25, 2014, Plaintiff emailed Yuen asking him to identify "exactly what specifics you have done to push the issue on releasing [the grievance] information[.]"  Doc. No. 48-20, HAUA's Ex. 19.

On October 1, 2014, HGEA confirmed that it would hold a Step 2 Grievance Meeting on October 7, 2014.  *See* Doc. No. 48-21, HAUA's Ex. 20. That same day, Plaintiff emailed Yuen:

> I am still concerned in regards to your response that HAUA did not receive any grievance information and still wants to go ahead with this meeting.
>
> All information from HGEA should be in writing and be given prior [to] any grievance meeting [and] I don't feel comfortable with this format.
>
> In my experience as a prior Union Agent, I never proceeded with a grievance meeting if the Employer did not provided (sic) any and all information they used to determine their adverse actions, why in my case it would

be different?

Why are you trying to push this meeting and not pushing the grievance information requested as the grievance stated, please advise?

You further state that it appears [HGEA] conducted the discharge without just and proper cause, if you are not sure and HGEA is not forthright providing such requested information this is very concerning, also it appears HGEA is playing a game.

Please pursue another letter or grievance to HGEA requesting such pertinent information and if not provided within a timely fashion you should proceed directly to arbitration.

Doc. No. 48-22, HAUA's Ex. 21.  Approximately thirty minutes later, Yuen replied:

I've attended grievance step meetings with little or no information provided by the employer.  At the meeting, we reiterate on and for the record that the requested information has still not been provided.  Delaying the scheduling of the step meeting to wait [for] information that may never come is not acceptable as the delay only denies you justice.  [HGEA's] actions appears arbitrary, capricious and without just and proper cause.  Moving the grievance to arbitration in the quickest possible manner will get you justice.

Doc. No. 48-23, HAUA's Ex. 22.

The next day, on October 2, 2014, Plaintiff responded to Yuen's

email as follows:

Thanks for the info.  In review of the [CBA], it states

15

"Any information in the possession of the Employer needed by the grievant or the Union to investigate and process a grievance shall be provided to them upon request within (7) working days." [HGEA] failed to do so and my previous e-mails where (sic) asking you to process another grievance regarding this matter, what is the status? Again I would like to meet but at the same time HGEA is violating [the CBA] and I feel this is not right going ahead with a step 2 grievance meeting without being able to investigate my wrongful termination prior to any hearings or meetings. Please advise.

Doc. No. 48-24, HAUA's Ex. 23. Approximately an hour later, Yuen replied:

Waiting for [HGEA] to provide information that they may not have only serves to delay the process. Are you asking me to delay the process? HAUA's goal is to move this case forward to resolve this matter if it means moving the case to arbitration and letting an arbitrator rule on the matter. I will be filing a grievance regarding the lack of information provided by [HGEA].

[HGEA] has not provided a reason for the discharge and HAUA does not have anything to investigate. If we continue to get nothing at the step 2 meeting, I'm prepared to move the case to arbitration.

If we receive reason or explanation or information for the discharge at the step 2 meeting, we can decide whether or not to proceed to arbitration or investigate the reason.

Doc. No. 48-25, HAUA's Ex. 24. Plaintiff responded the next morning stating

that he did not want to delay the process, but reiterating his concern that "HGEA

has not provided any and all requested grievance information [and] therefore I can

16

not (sic) proceed to a meeting until such time." Doc. No. 48-26, HAUA's Ex. 25.

Plaintiff further requested that Yuen "proceed with the additional grievance

pertaining to the requested grievance information . . . and keep me in the loop of

any developments." *Id.*

That same day -- October 3, 2014 -- Yuen filed a second grievance

with HGEA. Doc. No. 48-27, HAUA's Ex. 26. This grievance was a "Formal

Step 1 Grievance . . . regarding [HGEA's] failure to provide grievance information

in the possession of [HGEA] needed by [Plaintiff] and HAUA to investigate and

process the grievance filed on September 17, 2014. . . . HAUA reiterates our

request for a written reason for the discharge and all information that led to the

disciplinary action." *Id.* The October 3, 2014 Grievance requested the same

information HAUA requested in the September 17, 2014 Step 2 Grievance. *Id.*

HGEA did not provide either Plaintiff or HAUA with "any information or

documentation pursuant to the October 3, 2014 request for information." Doc. No.

68-1, Pl.'s Decl. ¶ 20.

On October 6, 2014, Plaintiff emailed Yuen and stated that he "will

not be able to attend the meeting tomorrow due to no information given for this

grievance. My termination was done a month ago and as of today have no

information or reason for this decision." Doc. No. 48-29, HAUA's Ex. 28.

b.     *The October 7, 2014 Step 2 Grievance Meeting*

The Step 2 Grievance Meeting was held on October 7, 2014.  Doc.

No. 44, HGEA's CSF ¶ 30.  Notwithstanding Plaintiff's concerns, he attended the

meeting with Yuen.  *Id.*  Holck and Julia Zeghmi ("Zeghmi"), the then-HGEA

Human Resources Manager, attended the meeting on behalf of HGEA.  *Id.*  Yuen,

Zeghmi, and Plaintiff all have slightly different accounts of the Step 2 Grievance

Meeting.

According to Yuen's notes, HGEA "indicated with no specifics that

discharge was based on HGEA 5 core values (Commitment, Service[,] Respect,

Team work, Communication)."  Doc. No. 48-30, HAUA's Ex. 29.  Moreover,

HGEA "[p]hilosophized about how staff work and private lives has an impact on

the organization and the importance of the perception of membership regarding

how they view the organization and staff."  *Id.*  According to Holck, Plaintiff

"called in sick yet was seen at a soccer game on the weekend when HGEA was

involved in PAC [Political Action Committee] activity on that weekend."  *Id.*  In

addition, Yuen's notes describe Holck accusing Plaintiff of rejecting "[Mitra]

assignment of additional cases indicating he can't take on more cases. . . . Holck

raised concerns [that Plaintiff's] rejecting cases had to be assigned to co-worker

[Nunez]."  *Id.*  Yuen's notes further state that "Holck indicated [Plaintiff] has a

copy of the core values. [Yuen] reiterated HAUA requested [HGEA] provide this type of documents as part of grievance information and Holck should provide and not make it the responsibility of [Plaintiff]." *Id.*

> According to Zeghmi:
>
> During the Step 2 grievance hearing, Holck explained to [Plaintiff] the reasons for [Plaintiff's] termination. These reasons included (1) while off of work on sick leave, [Plaintiff] attended recreational soccer games, (2) [Plaintiff] skipped work related events at which he was scheduled to participate in and on those same days he attended soccer games, and (3) [Plaintiff] did not take on more cases when told to by his supervisor Mitra. [Plaintiff] violated HGEA's core values.

*See* Doc. No. 44-3, Declaration of Julia Zeghmi ¶ 16.

Plaintiff did not speak at the Step 2 Grievance Meeting but he secretly recorded the meeting. *Id*. ¶ 15. According to Plaintiff's certified transcript of the meeting, Yuen began the meeting by saying:

> Let me start . . . .The reason we're here is because we believe that the discharge action taken by the employer was improper, without just and proper cause, and we're alleging that it's very arbitrary and capricious action, because termination, actually, is the ultimate (inaudible) employee can serve.
>
> However, what we find most disturbing in this case is there was no -- for one, no pre-disciplinary kind of meeting that would have given [Plaintiff] . . . opportunity . . . to face any accusations as to any concern regarding any disciplinary action that would have been on the

19

> horizon, much less termination. . . . We want to know
> what's the basis for the discharge, what evidence does
> the employer have that warranted this severe action. . . .
> We're asking for some kind of response so we can at
> least see how we can resolve this.  Any response?

Doc. No. 68-10, Pl.'s Ex. 8 at 3-4.  Holck first discussed HGEA's "core values" at

length.  *Id.* at 4-5.  Holck then said:

> if we take a look at this case . . . one of the things we're
> very concerned about was -- and one of the reasons for
> the actions was that if we have an agent, [Plaintiff],
> you're out ill -- and that's fine, you're sick, you're sick.
> We don't have a problem with that, but if you're out ill
> and you're seen at soccer games, that's -- how people
> perceive that, knowing that you're out ill, given a time
> when -- given a time when we're in the midst of political
> action and, you know, we have volunteers out there,
> they're busting their butts for [HGEA] and then they see
> a staff member at a soccer game, that's a problem.

*Id.* at 5.  Holck continued:

> When [Plaintiff] was asked to take on additional cases,
> he said he was too busy, he couldn't do it.  And that's a
> problem because I met with [Plaintiff] in February of this
> year and we went over his cases, and he did have quite a
> few cases.  He had -- if I can remember, he had like 25
> grievances, 30-some-odd-investigations, and 10
> consultations.  But when I asked him what kind of help
> do you need . . . he said, it's manageable . . . so we
> moved down to August, when, again . . . we needed help
> the most, [Plaintiff is] not available to help us.  We did
> look at [Plaintiff's] cases.  I couldn't find more -- we
> couldn't find more than I think it was 13 investigations
> that were open.  And then for investigations, if -- during
> the process of investigating, the case just sits.  So there's

> not a whole lot of action going on with those cases.  We
> found about six or seven grievances and about ten
> consultations.  So, you know, part of the reason . . . is
> . . . . [w]hat happened was that [Nunez] had to assume
> most of the work, the extra work, in addition to staff on
> Oahu.

*Id.* at 7-8.  Holck added that HGEA felt Plaintiff "abandoned [his] team" and that

"if we're truly a team and we're truly working together, you know, you don't . . .

abandon them. . . . So we had to do something.  We had to move, and that's

basically the reason for the termination."  *Id.* at 8.

Finally, Holck addressed HGEA's failure to provide documents in

response to HAUA's September 17th and October 3rd requests for grievance

information by saying: "With regard to the documents, you have the core values.  I

think you asked about the evaluations.  I think [Plaintiff] has it. . . . And all other

documents pertaining to the witnesses will be provided as needed in arbitration."

*Id.* at 8-9.

In response, Yuen pointed out that he thought Plaintiff's record with

HGEA was "exemplary," *id.* at 9, and told Holck: "I'm hearing you, but I still

think it's not a terminable offense."  *Id.* at 11.

  c.  *Plaintiff's meeting with Yuen*

After the Step 2 Grievance Meeting ended, Plaintiff and Yuen talked,

and Plaintiff also recorded this conversation.  *See* Doc. No. 68-11, Pl.'s Ex. 9.

Yuen told Plaintiff, "just like you said, there's no incident that would nail you

down to either committing an act so heinous that it would require immediate

discharge without much notice.  All this kind of stuff is, yeah, work related, not

taking cases." *Id.* at 4.  Plaintiff interrupted Yuen, saying "That's not true. That's

not true." *Id.*  Yuen asked Plaintiff to provide evidence so that he could "start

leveraging" HGEA. *Id.* at 5.  Plaintiff refused, saying, "No, we need to know what

they have got." *Id.*  Yuen acknowledged that "[t]he employer has to provide

everything" and that HGEA only "provided some very broad stuff." *Id.*  at 6.

Plaintiff then asked, "So how can we build a defense case if they don't give us

exact specific dates and times as to whatever they put on the reasons of the

discharge . . ."? *Id.*  Yuen responded:

> Same thing, if we start moving into arbitration, okay, and
> they start talking broad and we start asking specifics and
> they still go broad, that helps us, but if they have
> specifics and we hearing it there, okay, because if that's
> where they want to take us, that's where it's gonna end
> up.  If you feel comfortable that that's how we're gonna
> dance with them, fine.  If you're gonna say, no, we don't
> move till we get information, guess what, this case not
> gonna [move] for a long time.  Right now they
> scrambling because we keep pushing.

*Id.* at 7.  Plaintiff said, "Move it." *Id.*  Yuen replied:

> Yeah, we gonna move 'em.  We gonna file for
> arb[itration].  We're gonna ask them to provide.  We're
> gonna ask the arbitrator to compel them to give us

> whatever they got, and if they don't have all the details
> and everything, okay.
> . . . .
> You all in, and this is what I need from you.  You cannot
> afford an attorney, I'm going to do (inaudible)
> arbitration. . . . Like you said, we don't know what the
> specifics are, we won't know until we get it whether or
> not we're going to need specific witnesses to specific
> events.
>
> But right now it seems like they focused on one event.
> There was a time when you were seen playing soccer and
> allegedly you were on sick leave.

*Id.* at 7-16.  Plaintiff informed Yuen that HGEA was "probably looking at . . . the

weekend."  *Id.* at 16.  Yuen said:  So if you were out during the week (inaudible)

physical or mental or what?  Because I can defend mental if you were seen playing

soccer (inaudible)."  *Id.*  Plaintiff said: "My last doctor's note to the employer was

that I had occupational stress.  That was submitted to them on September 3rd."  *Id.*

        d.    *Yuen files intent to arbitrate Plaintiff's grievance and informs
            Plaintiff he will recommend HAUA proceed to arbitration*

On October 16, 2014, HGEA denied Plaintiff's grievance.  Doc. No.

48-31, HAUA's Ex. 30.  On October 21, 2014, Yuen emailed Plaintiff that HAUA

filed a letter of intent to escalate Plaintiff's grievance to Step 3 and take it to

arbitration.  Doc. No. 68-14, Pl.'s Ex. 12.  *See also* Doc. No. 44-31, HGEA's Ex.

27, HAUA's Notice of Intent to Arbitrate.  Yuen also explained HAUA's policy

and procedure regarding its Arbitration Review Board ("ARB").  Doc. No. 68-14,

Pl.'s Ex. 12.  In addition, Yuen wrote: "The ARB *will* be presented with *my*

*recommendation to proceed to arbitration* for decision and HAUA vote."  *Id.*

(emphasis added).  On October 29, 2014, Yuen "notified HAUA of Plaintiff's case

and of filing the letter of intent to arbitrate Plaintiff's case."  Doc. No. 48-1, Yuen

Decl. ¶ 58.

    e.  *Yuen changes his mind*

   According to Yuen, at some unspecified point after the Step 2

Grievance Meeting, he "did more investigation" to determine whether HGEA

could support its contention that Plaintiff had been playing soccer while on sick

leave.  *Id.* ¶ 57.  Yuen says that he "learned that an HGEA member had reported

Plaintiff to Maui Union Agent Tehani Nunes (sic) who went to the soccer field to

verify that Plaintiff was in fact playing soccer although he had called in sick and

was supposed to be at the PAC event."[12]  *Id.*

   Yuen subsequently prepared a "Just Cause Assessment" of Plaintiff's

---

[12]  Plaintiff says that "HAUA never called [him] to discuss the allegation that [he] was seen playing soccer during a PAC event, after a PAC event or during sick leave."  Doc. No. 68-1, Pl.'s Decl. ¶ 23.  Plaintiff further states that "HAUA never advised [him] that calling in sick and being on leave status, not attending a PAC activity, but being seen playing soccer when allegedly sick, or refusing work and case assignments could be a basis for termination.  On the contrary [Yuen] consistently said otherwise."  *Id.* ¶ 24.  According to Yuen, he discussed this information with Plaintiff during telephone conversations prior to the Step 2 Grievance Meeting.  Doc. No. 73-1, Second Yuen Decl. ¶¶ 8, 11.  In any event, Plaintiff's recordings make clear that Yuen was generally aware of these allegations before Yuen informed Plaintiff and HGEA of HAUA's intent to arbitrate and Yuen's intent to recommend arbitration.  *See generally* Doc. Nos. 68-10, 68-11, Pl.'s Exs. 8, 9.

grievance.[13]  *Id.* ¶ 60.  A "Just Cause Assessment" requires the union agent to

answer the following seven questions:

1. Did the Employer adequately warn the Employee of the consequences of his conduct?
2. Was the Employer's rule or order reasonably related to efficient and safe operations?
3. Did the Employer investigate before administering the discipline?
4. Was the investigation fair and objective?
5. Did the investigation produce substantial evidence or proof of guilt?
6. Were the rules, orders and penalties applied evenhandedly and without discrimination to all Employees?
7. Was the penalty reasonably related to the seriousness of the offense and the past record?

*See* Doc. No. 48-35, HAUA's Ex. 34.  Notwithstanding Yuen's prior statements to

Plaintiff, Yuen answered all seven questions affirmatively.  *Id.*

In addition, Yuen provided context, with details, in support of his

affirmative answers that appears inconsistent with Yuen's prior conduct.  For

example, in response to the first question -- "Did the Employer adequately warn

the Employee of the consequences of his conduct?" -- Yuen answered:

---

[13]  The "Just Cause Assessment" is prefaced by the following explanatory template: "Regular employees shall not be disciplined without proper cause.  The 7 Point Test taken from the Enterprise Wire Arbitration defines the following seven (7) questions as a mechanism to determine whether or not there has been a violation of an Employees (sic) just and proper cause rights.  A no answer to any of the seven questions would render the disciplinary action taken by the Employer as inappropriate and unfair."  Doc. No. 48-35, HAUA's Ex. 34.

> Yes.  Employer and Employees (including Grievant)
> collaborated and trained together on the development of
> the "Core Values" of Commitment, Service, Respect,
> Teamwork and Communication.  All Employees
> (including Grievant) were trained and forewarned of the
> outcome and consequence when failing to adhere to the
> Core Values.  Individuals within the organization not
> supporting the Core Values and one another, had no
> place in the organization and should seek employment
> elsewhere.  Failing to follow the Core Values would
> subject the organization to internal strife and
> divisiveness and negatively impact member perception
> of the organization.

*Id.*  And, in response to the third question -- "Did the Employer investigate before

administering the discipline?" -- Yuen answered:

> Yes.  Employer received and acted upon report that
> Grievant while on sick leave was witnessed by member
> who notified staff who verified and notified Division
> Chief of Grievants (sic) participation in social sports
> activity while fellow co-workers and Union members
> were engaged in required Union activity.  Grievants (sic)
> actions does (sic) not uphold commitment to whole-
> heartedly support and participate in required Union
> activities and events.  The Members (sic) sighting and
> reporting of Grievant's participating in sports activities
> while on sick leave contributes to a negative perception
> by members of staff not committed to walking the talk of
> commitment and participating in required in (sic) Union
> activities.

*Id.*  Moreover, Yuen stated on several occasions that Plaintiff "admitted to the

facts."  *Id.*  For example, Yuen said that Plaintiff "admitted to refusing to accept

additional cases."  *Id.*  Finally, Yuen even implied that HGEA should have gone

26

further and charged Plaintiff with insubordination, stating: "Although not charged

with insubordination, [Plaintiff's] actions appear insubordinate. . . . [HGEA's]

issuance of the ultimate penalty of discharge from employment is with proper

cause." *Id.*

After completing the Just Cause Assessment, Yuen "informed the

ARB of my assessment HGEA had met the 7 step test for just and proper cause."

Doc. No. 48-1, Yuen Decl. ¶ 61.  Yuen "advised the ARB that given the facts, [he]

could not recommend that the HAUA agree to arbitrate the grievance although it

was for the ARB to consider the issue and make a decision as to how it wished to

proceed." *Id.* ¶ 62.  There is no evidence in the record that Yuen consulted with

Plaintiff regarding his changed views, or that Yuen apprised Plaintiff of his

decision to change his recommendation.

On November 5, 2014, Yuen submitted a memo to the ARB regarding

the "relevant information concerning Plaintiff's grievance." *Id.* ¶ 63.  *See also*

Doc. No. 68-16, HAUA's Ex. 14, Arbitration Review.  In relevant part, Yuen

wrote to the ARB:

> [Plaintiff] from the onset of the termination of his
> employment, has not been forthright in providing HAUA
> information requested to mitigate potential reason for the
> termination.  While [HGEA] has the burden of proof
> defending its termination action, HAUA has faced
> challenges when dealing with the [Plaintiff] to provide

27

> explanation and rationale for the inclusion of the
> additional articles he requested to be included in the
> grievance.  [Plaintiff] persisted HAUA maintain
> timelines in moving the grievance forward; yet was not
> the most cooperative in facilitating moving of the
> grievance forward exhibited by his reluctance to attend
> the [Step 2 Grievance Meeting] until HAUA strongly
> advised him to be present.

*Id.* at 1-2. Yuen continued:

> [Plaintiff] insisted HAUA include . . . additional articles
> in the grievance [on top of Article 12] . . . [but Plaintiff]
> has not provided explanation or rationale to assist
> HAUA in arguing the additional articles.  HAUA is
> concerned the additional articles may cloud the issue of
> termination without just and proper cause and [HGEA]
> may utilize the articles to discredit [Plaintiff] and
> characterize [Plaintiff] as a disgruntled employee who
> purposefully remained off work to disrupt operations[.]
>
> During the Step 2 Grievance Meeting, [HGEA] cited
> [Plaintiff's] failure to adhere to HGEA's Core Values
> Standards.  [HGEA] cited [Plaintiff's] refusal to accept
> additional cases and share in the increased [workload
> when Mitra was promoted] . . . [HGEA] cited Incident
> (sic) where [Plaintiff] called in sick and was seen playing
> soccer on the weekend while [HGEA] staff and
> volunteers were involved in PAC activities.
>
> [HGEA] maintains [Plaintiff's] behavior and actions
> witnessed by co-workers and members failed to adhere
> to HGEA's Core Values Standards of Commitment,
> Service, Respect, Teamwork and Communication.

*Id.* at 2.  On November 13, 2014, the ARB voted "Do Not Proceed to Arbitration"

and signed Yuen's memo to that effect.  *Id.*  The ARB then "sent a memorandum

to all HAUA members advising them of its recommendation and advising that the HAUA members would make the decision as to whether to move forward to arbitration.  Doc. No. 48-1, Yuen Decl. ¶ 65.  No HAUA members voted to move forward with arbitration.  *Id*. ¶ 67.

On November 25, 2014, Yuen advised Plaintiff "that the HAUA had voted against moving forward with arbitration."  *Id*. ¶ 68.  Yuen's letter states: "It is with regret that I inform you . . . [HAUA] will not be taking your case to arbitration."  Doc. No. 48-38, HAUA's Ex. 37.

## B.    Procedural Background

On May 12, 2015, Plaintiff filed this action.  Doc. No. 1.  On March 8, 2016, HGEA filed its Motion for Summary Judgment, Doc. No. 43, and on March 9, 2016, HAUA filed its Motion for Summary Judgment.  Doc. No. 47.  On March 11, 2016, HAUA filed a Motion for Joinder to HGEA's Motion for Summary Judgment.  Doc. No. 50.  On March 24, 2016, both Defendants filed a Statement of No Opposition to each others' Motion for Summary Judgment.  Doc. Nos. 60, 61.  Plaintiff filed a consolidated Opposition in response to Defendants' Motions for Summary Judgment on April 11, 2016.  Doc. No. 67.  A hearing was held on May 1, 2016.  Doc. No. 78.  Following the hearing, the court instructed Plaintiff to clarify whether his IIED claim extended to Yuen, Mitra, and Holck.

Doc. No. 79.  Plaintiff clarified that he "intended his claims to be solely against HGEA and HAUA."  *See* Doc. No. 82, Response at 3.

### III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004).  "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a *genuine issue for trial*."  *Matsushita*

30

*Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment). Moreover, uncorroborated allegations and self-serving testimony do not create genuine issues of material fact. *See Prindable v. Ass'n of Apartment Owners of 2987 Kalakaua*, 304 F. Supp. 2d 1245, 1253 (D. Haw. 2003).

      "An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor" (citations omitted)).

# IV. **DISCUSSION**

For the reasons that follow, the court DENIES Defendants summary judgment as to Counts I and II.  The court GRANTS HGEA summary judgment as to Count III and DENIES HAUA summary judgment as to Count III.

## A.    **Plaintiff's Hybrid § 301/Fair Representation Claims (Counts I and II)**

A hybrid § 301/fair representation action "comprises two causes of action" that sink or swim together.  *Bliesner v. Commc'n Workers of Am.*, 464 F.3d 910, 913 (9th Cir. 2006).  That is:

> The suit against the employer rests on § 301, since the employee is alleging a breach of the collective bargaining agreement. The suit against the union is one for breach of the union's duty of fair representation, which is implied under the scheme of the National Labor Relations Act. Yet the two claims are inextricably interdependent.  To prevail against either the company or the Union, employee-plaintiffs must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating breach of duty by the Union.

*Id.* (alterations omitted) (citing *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164-65 (1983)).  Accordingly, "[t]he plaintiff must show that there has been both a breach of the duty of fair representation and a breach of the CBA."  *Id.*

The court (1) addresses the threshold statute of limitations issue HGEA raised regarding § 301; and (2), for the reasons that follow, finds that

Plaintiff has raised a genuine issue of material fact with regard to both aspects of his hybrid § 301/fair representation claim (Counts I and II).

### 1. Statute of Limitations

HGEA argues that Plaintiff's claims are barred by the statute of limitations. Doc. No. 43, HGEA Mot. at 28. A hybrid § 301/fair representation claim is subject to a six-month statute of limitations after the cause of action accrues. *See DelCostello*, 462 U.S. at 174 (holding that hybrid § 301/fair representation claims are "governed by the six-month provision of § 10(b)" of the NLRA). "The limitations period begins to run when a Plaintiff receives a letter from the Union notifying her that it will pursue her claim no further." *Grant v. McDonnell Douglas Corp.*, 163 F.3d 1136, 1138 (9th Cir. 1998).

Yuen wrote Plaintiff a letter on November 25, 2014 informing Plaintiff that HAUA decided not to arbitrate his grievance. Doc. No. 48-38, HAUA's Ex. 37. Because Plaintiff filed his Complaint on May 12, 2015, Doc. No. 1, Compl., within the six-month window, the action is timely.

HGEA's arguments to the contrary are unpersuasive. Relying on *Galindo v. Stoody Co.*, 793 F.2d 1502, 1509 (9th Cir. 1986), HGEA argues that there is an open question as to "whether accrual occurs when the employee learns, or should have learned, that his dispute was finally resolved . . . or whether accrual

33

occurs when the employee learns, or should have learned, that the union may have violated its duty of fair representation." (alterations added and quotations omitted). HGEA argues it is the latter -- that Plaintiff "should have learned" HAUA violated its duty of fair representation before Yuen informed Plaintiff that HAUA decided not to arbitrate his grievance.

HGEA is mistaken for two reasons. First, *Galindo* makes clear that "[a] reasoned analysis of the question when a duty of fair representation claim accrues must focus on the context in which the claim arose." *Id.* In the present context, "[t]he limitations period begins to run when . . . [Plaintiff] receives a letter from the Union notifying [him] that it will pursue [his] claim no further." *Grant*, 163 F.3d at 1138. *See also Stallcop v. Kaiser Found. Hosp.*, 820 F.2d 1044, 1049 (9th Cir. 1987); *Miletak v. Commc'n Workers of Am.*, 2014 WL 1616439, at *3 (N.D. Cal. Apr. 22, 2014). Second, even assuming *Galindo*'s exception applies here, there is a genuine issue of material fact as to whether Plaintiff knew or should have known that HAUA violated its duty of fair representation before he received Yuen's November 25, 2014 letter. That is, until Plaintiff knew that HAUA was not going to proceed with arbitration, any complaint Plaintiff might have had against HAUA would have been "too speculative to be proven" and therefore premature. *Allen v. United Food & Commercial Workers Int'l Union,*

*AFL-CIO, CLC*, 43 F.3d 424, 427 (9th Cir. 1994).

## 2.   *Breach of CBA (Count I)*

HGEA next argues that Plaintiff was terminated in accordance with the CBA because Plaintiff's actions "warranted immediate termination." Doc. No. 43, HGEA Mot. at 15. Plaintiff argues, in response, that HGEA violated multiple Articles of the CBA when it terminated him. *See* Doc. No. 48-6, HAUA's Ex. 5. Finding that there is a genuine issue of material fact as to whether HGEA breached Article 12 of the CBA, the court declines to examine Plaintiff's remaining allegations.

According to Article 12 of the CBA, "[n]o permanent Employee shall be disciplined or discharged without proper cause." Doc. No. 44-8, HGEA's Ex. 4, CBA Article 12 - Discipline and Discharge, ¶ A. Although the term "proper cause" is not defined, HGEA's current explanation for its proper cause to terminate is that:

> 1) while off of work on sick leave, he attended (and likely participated in) recreational soccer games on August 23, 2014 and August 30, 2014, 2) he skipped the . . . [PAC] events, held on August 2, 2014 and August 9, 2014, after committing to and being scheduled to participate in those events, yet on those very same days he attended and participated in recreational soccer games and 3) he did not take on more work when told to by his supervisor Mitra. Individually and collectively, each of these acts by [Plaintiff] warranted termination[.]

35

Doc. No. 72, HGEA Reply at 5.[14]  The court addresses each of these explanations in turn.

> a.    "[W]hile off sick leave, he attended (and likely participated in) recreational soccer games on August 23, 2014 and August 30, 2014"

There is no evidence that HGEA knew of Plaintiff's participation in the August 23, 2014 and August 30, 2014 soccer games when HGEA terminated Plaintiff; the only evidence in the record regarding Plaintiff's attendance at these games is from information obtained during discovery.  *See* Doc. No. 44, HGEA's CSF ¶¶ 23-24 (accusing Plaintiff of attending soccer games on August 23rd and August 30th and citing as evidence Plaintiff's deposition in this action).  And, obviously, if HGEA was unaware that Plaintiff played soccer on August 23rd and August 30th, he could not have been terminated for that reason.  This after-the-fact rationale appears pretextual and provides no support for HGEA.[15]

---

[14]  HGEA also argues that Plaintiff was terminated for violating its "Core Values."  *See* Doc. No. 44-30, HGEA's Ex. 26.  But the CBA makes clear that it "shall" prevail as to any conflict "between the provisions of [the CBA] and any directive of the Employer."  Doc. No. 44-8, HGEA Ex. 4, CBA Article 2- Conflict.  So, regardless of any standards HGEA established outside the CBA, HGEA still could not terminate Plaintiff "without proper cause."  *See id.* at Article 12.

[15]  But even if HGEA knew Plaintiff participated in those games at the time HGEA terminated him, there is a genuine issue of material fact as to whether Plaintiff's participation in soccer games on two Saturdays while out on sick leave constitutes "proper cause" for termination without any warning.  *See* Doc. No. 68-17, Pl.'s Ex. 15 (admitting that "Plaintiff was not contacted or warned to discuss his employment status").  This is especially so given Plaintiff's

(continued...)

    b.     *"[H]e skipped the . . . [PAC] events, held on August 2, 2014 and August 9, 2014, after committing to and being scheduled to participate in those events, yet on those very same days he attended and participated in recreational soccer games"*

Again, there is a genuine issue of material fact as to whether Plaintiff's failure to participate in two voluntary PAC events constitutes "proper cause" for immediate termination without any warning.  This is especially true in light of evidence that (1) participation in political events was voluntary; (2) Plaintiff's participation in the soccer games was consistent with his doctor's advice, Doc. No. 68-1, Pl.'s Decl. ¶ 11; (3) the PAC events appear to have been in the morning whereas Plaintiff's soccer games appear to have been in the afternoon; (4) Plaintiff had "never been warned, cited, reprimanded or otherwise disciplined during [his] 10 year career at HGEA," *Id.* ¶ 2; and (5) HGEA knew that Plaintiff was suffering from "occupational stress" before HGEA fired him. *See* Doc. No. 68-3, Pl.'s Ex. 1.  In light of the foregoing evidence, a reasonable fact finder could find that HGEA's termination of Plaintiff for missing two voluntary PAC events did not constitute "proper cause."

---

[15](...continued)
evidence that participation in these games was consistent with his doctor's recommendation while he was out on sick leave, *see, e.g.*, Doc. No. 68-1, Pl.'s Decl. ¶ 11, and the fact that HGEA knew Plaintiff was suffering from "occupational stress" the day before firing him.  *See* Doc. No. 68-3, Pl.'s Ex. 1.  A reasonable fact finder could find that HGEA's termination of Plaintiff for this reason did not amount to "proper cause."

      c.    *"[H]e did not take on more work when told to by his supervisor Mitra"*

Finally, there is a genuine issue of material fact as to whether Plaintiff refused additional work from Mitra.  While Nunez says that Plaintiff refused extra work, Doc. No. 44-4, Nunez Decl. ¶ 4, Plaintiff disagrees.  *See* Doc. No. 68-1, Pl.'s Decl. ¶ 22.  Further, during the Step 2 Grievance Meeting, Holck stated that when HGEA needed help in August, Plaintiff was "not available to help us."  Doc. No. 68-10, Pl.'s Ex. 8 at 7.  But Plaintiff was out on sick leave for over half of August.  *See* Doc. No. 44, HGEA's CSF ¶ 20.  Terminating an employee for being unable to work while on sick leave is not "proper cause" for termination.

In short, there are genuine issues of material fact with regard to whether HGEA breached Article 12 of the CBA.  The court therefore DENIES Defendants summary judgment as to Count I.

### 3.    *Duty of Fair Representation (Count II)*

A union's duty of fair representation is "implied from its status under § 9(a) of the NLRA as the exclusive representative of the employees in the unit, to represent all members fairly."  *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 44 (1998).  This duty "requires a union to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with good faith and honesty, and to avoid arbitrary conduct."  *Id.* (citation and quotation

marks omitted).  Put simply: "a union breaches the duty of fair representation when its conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith." *Id.*  "Conduct can be classified as arbitrary only when it is irrational, when it is without a rational basis or explanation." *Beck v. United Food and Commercial Workers Union, Local 89*, 506 F.3d 874, 879 (9th Cir. 2007) (citation and quotation marks omitted).  "To establish that the union's exercise of judgment was discriminatory, a plaintiff must adduce substantial evidence of discrimination that is intentional, severe, and unrelated to legitimate union objectives." *Id.* at 880 (citation and quotation marks omitted).  Finally, "[t]o establish that the union's exercise of judgment was in bad faith, the plaintiff must show substantial evidence of fraud, deceitful action or dishonest conduct." *Id.* (citations and quotations omitted).  In essence, a plaintiff must prove that the union's conduct was "inexplicable." *Peters v. Burlington N.R.R. Co.*, 931 F.2d 534, 539-40 (9th Cir. 1991).  Ultimately, "so long as a union exercises its judgment, no matter how mistakenly, it will not be deemed to be wholly irrational." *Beck*, 506 F.3d at 879 (citations and quotations omitted).

Here, viewing the evidence in the light most favorable to Plaintiff, a reasonable fact finder could conclude that Yuen's recommendation not to proceed to arbitration, in light of his prior actions and statements, was "inexplicable."  In

39

fact, the record provides little evidence as to why Yuen informed Plaintiff on October 21, 2014 that "[t]he ARB will be presented with my recommendation to proceed to arbitration," Doc. No. 68-14, Pl. Ex. 12, and then shortly thereafter decided not to recommend arbitration for Plaintiff.  Although Yuen claims that he did some further investigation and wasn't receiving full cooperation from Plaintiff, there is nothing in the record that adequately explains Yuen's changed position, and the reasons Defendants provide could certainly be found to be pretextual.

Moreover, Yuen's answers to the Just Cause Assessment certainly could be viewed by a jury to be arbitrary, "inexplicable," or made in bad faith.  For example, Yuen answered the first question of the Just Cause Assessment -- "Did the Employer adequately warn the Employee of the consequences of his conduct?" -- affirmatively.  Doc. No. 48-35, HAUA's Ex. 34.  But at the Step 2 Grievance Meeting, Yuen stated that HGEA did not give Plaintiff *any* warning prior to his termination.  Doc. No. 68-10, Pl.'s Ex. 8 at 3-4 ("what we find most disturbing in this case is there was no . . . pre-disciplinary kind of meeting that would have given [Plaintiff] . . . opportunity . . . to face any accusation as to any concern regarding any disciplinary action").

Moreover, Yuen answered the seventh question of the Just Cause Assessment -- "Was the penalty reasonably related to the seriousness of the

offense and the past record? -- affirmatively.  *See* No. 48-35, HAUA's Ex. 34.  But at the Step 2 Grievance Meeting, Yuen stated that Plaintiff's termination was *not* reasonably related to HGEA's conduct and cited Plaintiff's "exemplary" past record.  *See* Doc. No. 68-10, Pl. Ex. 8 at 9 (stating that Plaintiff's past record was "exemplary"), 11 (stating that "I'm hearing you, but I still think it's not a terminable offense").

Yuen also says in the Just Cause Assessment that Plaintiff "admitted to refusing to accept additional cases."  Doc. No. 48-35, HAUA Ex. 34.  But according to Plaintiff's recorded conversation with Yuen after the Step 2 Grievance Meeting, Plaintiff clearly and explicitly denied ever refusing to accept additional work.  *See* Doc. No. 68-11, Pl. Ex. 9 at 4 (showing that Plaintiff told Yuen, "That's not true. That's not true." when Yuen mentioned HGEA's allegations that Plaintiff refused work).  Given the conflicting evidence and the context in which it arose, there is a genuine issue of material fact as to whether Yuen's statements on the Just Cause Assessment were in bad faith.

These examples are illustrative, not exhaustive.  Put simply, the Just Cause Assessment raises several genuine issues of material fact because a reasonable fact finder could find there is no "rational basis or explanation" for Yuen's changed views, and/or that Yuen's changed position is simply

"inexplicable."

   The court is aware that, at some point after the Step 2 Grievance

Meeting and before Yuen completed the Just Cause Assessment, he "did more

investigation" and learned that HGEA sent Nunez "to verify that Plaintiff was in

fact playing soccer although he had called in sick and was supposed to be at the

PAC event."  Doc. No. 48-1, Yuen Decl. ¶ 57.  And the court understands

HAUA's position that Plaintiff was uncooperative and failed to provide evidence

to support his grievances despite Yuen's repeated requests.  But neither of these

arguments resolve the notable inconsistency between Yuen's statements at the

Step 2 Grievance Meeting and his answers in the Just Cause Assessment.  This is

especially true given that Yuen assured Plaintiff after the Step 2 Grievance

meeting that he would support proceeding to arbitration even if Plaintiff continued

not to provide information in support of his grievance.  *See* Doc. No. 68-11, Pl.'s

Ex. 9 at 7 ("If you feel comfortable that that's how we're gonna dance with them,

fine.").

   In short, there are genuine issues of material fact with regard to

whether HAUA breached its duty of fair representation.  As such, the court

DENIES summary judgment as to Count II.

B.     **Plaintiff's IIED Claim (Count III)**

Defendants challenge Plaintiff's IIED claim based on (1) § 301

preemption and (2) there is no genuine issue of material fact.

Section 301 provides: "Suits for violation of contracts between an

employer and a labor organization . . . may be brought in any district court of the

United States having jurisdiction of the parties."  29 U.S.C. § 185(a).  Under

§ 301, "courts apply substantive federal law to labor contract disputes, and federal

courts are authorized to fashion a body of federal common law to govern disputes

arising out of labor contracts."  *E.E.O.C. v. NCL Am.*, 535 F. Supp. 2d 1149, 1166

(D. Haw. 2008) (citing *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 456

(1957)).  "As a result of this broad federal mandate, the Supreme Court has

explained, the preemptive force of section 301 is so powerful as to displace

entirely any state cause of action for violation of contracts between an employer

and a labor organization."  *Id.* (internal quotations and citations omitted).  Thus, if

Plaintiff's IIED claim stems out of the CBA, his claim is preempted.  And "[e]ven

if the claims involve rights conferred by state law, independent of a CBA, the

claims are preempted if they are 'substantially dependent' on analysis of a CBA."

*Id.* (citation omitted).  If, however, "the claim is plainly based on state law, § 301

is not mandated simply because the defendant refers to the CBA in mounting a

defense. Thus, a claim is not preempted if it poses no significant threat to the collective bargaining process and furthers a state interest in protecting the public transcending the employment relationship." *Id.* (citation and quotation marks omitted).

Here, Plaintiff alleges that "Defendants' treatment of Plaintiff . . . constitutes extreme and outrageous behavior which exceeds all bounds usually tolerated by decent society. Defendants' actions and omissions were done with malice, with the intent to cause or knowledge that it would cause, severe mental distress to Plaintiff." Doc. No. 1, Compl. ¶ 70.

HGEA argues that Plaintiff's IIED claim is preempted because it arises from "alleged violations of the CBA." Doc. No. 43, HGEA Mot. at 31. Plaintiff has failed to explain how any portion of his IIED claim against HGEA is distinct from the CBA, and it appears that any IIED claim against HGEA would be substantially dependant on the CBA.[16] As such, the court GRANTS HGEA summary judgment on Plaintiff's IIED claim.

However, Plaintiff more clearly distinguished HAUA's conduct from the CBA. For example, Plaintiff argues that Yuen's October 21, 2014 email to

---

[16] It is also possible that Plaintiff's IIED claim is barred by the exclusivity provision in the Hawaii Workers' Compensation Law, which limits the "rights and remedies" available "on account of a work injury suffered by the employee." *See* Haw. Rev. Stat. § 386-5. The parties have not briefed this issue, and the court need not address it.

Plaintiff "turned out to be a complete lie" and stated that Yuen's Just Cause

Assessment was a "tortured effort to justify" his subsequent "irrational

assessments" not to proceed to arbitration.  Doc. No. 67, Opp'n at 33-34.  Plaintiff

further argues that "[d]ishonest representation in bad faith by a union agent would

be outrageous by any measure.  This is especially so given HAUA's direct

knowledge of Plaintiff's condition."  *Id.* at 38.

       To the extent that Plaintiff is arguing that HAUA caused him IIED

because Yuen lied to him, the court finds that this conduct is not preempted.  Such

a claim "poses no significant threat to the collective bargaining process and

furthers a state interest in protecting the public transcending the employment

relationship."  *NCL America*, 535 F. Supp. 2d at 1166.  That is, such a claim

effectively reinforces the sanctity of the bargaining process and the

union/employee relationship, both of which presume that the interests of the union

and the employee are aligned.  *See Humble v. Boeing Co.*, 305 F.3d 1004, 1014

(9th Cir. 2002) (explaining that § 301 preemption was designed to guard against

the "risk that the claim will result in circumvention of the CBA and its arbitration

provisions").  Indeed, a union's duty of fair representation is "comparable to an

action by a trust beneficiary against a trustee for a breach of fiduciary duty"

because "[j]ust as a trustee must act in the best interests of the beneficiaries, a

union, as the exclusive representative of the workers, must exercise its power to act on behalf of the employees in good faith." *Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 567 (1990) (internal citations omitted).  Accordingly, to the extent Plaintiff's IIED claim against HAUA is premised on his allegations that Yuen lied to him, the court finds that such a claim is not preempted because "the CBA does not cover the allegedly extreme and outrageous conduct." *Brown v. Brotman Med. Ctr., Inc.*, 571 F. App'x 572, 574 (9th Cir. 2014).

The elements of IIED under Hawaii law are: (1) that the act allegedly causing the harm was intentional or reckless, (2) that the act was outrageous, and (3) that the act caused (4) extreme emotional distress to another.  *See Enoka v. AIG Hawaii Ins. Co., Inc.*, 109 Haw. 537, 559, 128 P.3d 850, 872 (Haw. 2006).  As discussed with regard to Count II, there are genuine issues of material fact surrounding the inconsistency between Yuen's statements at the Step 2 Grievance Meeting and his Just Cause Assessment.  Drawing all reasonable inferences in favor of the Plaintiff, the court concludes that a reasonable fact finder could find that such conduct was, in effect, Yuen lying to Plaintiff.  And this creates a genuine issue of material fact because a reasonable fact finder could find that such behavior was "outrageous," especially given HAUA effectively owed Plaintiff a

46

fiduciary duty to act on Plaintiff's behalf in good faith.  *See Terry*, 494 U.S. at 567.  The court therefore DENIES HAUA summary judgment to the extent that Plaintiff's IIED claim against HAUA is premised on his allegations that Yuen lied to him.

## V.  <u>CONCLUSION</u>

Based on the foregoing, the court DENIES in part and GRANTS in Part Defendants' Motions for Summary Judgment, Doc. Nos. 43 and 47. Specifically, the court GRANTS Defendants' Summary Judgment Motions as to Yuen, Mitra and Holck; these three individuals are dismissed from this action.  In all other respects, the court DENIES Defendants' Motions for Summary Judgment with regard to Count I and Count II.

///

///

///

///

///

///

///

///

As to Count III, the court GRANTS HGEA summary judgment and DENIES

HAUA summary judgment.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, May 20, 2016.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*Kirchhof v. Haw. Ass'n of Union Agents, Haw. Gov't Emp. Ass'n, Local 152, Am. Fed'n of State, County and Mun. Emp., AFL/CIO (HGEA/AFSCME LOCAL 152) et al.*, Civ. No. 15-00175 JMS-KSC, Order (1) Denying in Part and Granting in Part Defendants' Motions for Summary Judgment, Doc. Nos. 43 and 47; and (2) Granting HAUA'S and Yuen's Motion for Joinder, Doc. No. 50